**STATE of Minnesota, Appellant,**

v.

**Alan J. MYERS, Respondent.**

No. A05–1604.

Court of Appeals of Minnesota.

March 14, 2006.

Review Granted May 16, 2006.

**114** ◼ ◼

Mike Hatch, Attorney General, St. Paul, MN; and Raymond F. Schmitz, Olmsted County Attorney, David F. McLeod, Assistant County Attorney, Rochester, MN, for appellant.

Douglas V. Hazelton, Hazelton Law Offices, Minneapolis, MN, for respondent.

Considered and decided by RANDALL, Presiding Judge; PETERSON, Judge; and HUSPENI, Judge.*

## OPINION

PETERSON, Judge.

In this appeal from a pretrial order dismissing a charge of refusal to submit to a chemical test, the state argues that the district court erred in concluding that because the implied-consent advisory administered to respondent did not inform respondent that test refusal is a gross misdemeanor that may result in harsher penalties than test failure, the advisory violated respondent's due-process rights. We reverse and remand.

## FACTS

State Trooper Stephen Willert stopped to investigate a vehicle that he saw stopped on the shoulder of Highway 52. Willert identified the driver as respondent Alan Myers, and after determining that there was probable cause for an arrest, Willert arrested respondent for driving while impaired (DWI) and transported him to a police station.

At the station, Willert read to respondent an implied-consent advisory that included the statement, "Refusal to take a test is a crime." Respondent was provided with a telephone and a telephone book so that he could contact an attorney before deciding whether to submit to the test, and

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

during the following 50 minutes, respondent attempted to contact an attorney. After several unsuccessful attempts to contact an attorney, a second reading of the implied-consent advisory, and a lengthy question-and-answer discussion about the advisory, respondent insisted upon consulting with an attorney before taking a chemical test, and Willert concluded that respondent refused to submit to testing.

Respondent was charged with third-degree DWI (refusal to submit to a chemical test) in violation of Minn.Stat. § 169A.20, subd. 2 (2004), and Minn.Stat. § 169A.26 (2004), and fourth-degree DWI in violation of Minn.Stat. § 169A.20, subd. 1(1) (2004), and Minn.Stat. § 169A.27 (2004). Respondent moved to dismiss the test-refusal charge, arguing that the implied-consent advisory violated his due-process rights. Following an omnibus hearing, the district court granted respondent's motion to dismiss the test-refusal charge after concluding that the implied-consent advisory administered to respondent violated respondent's due-process rights because it did not inform respondent that a test refusal is a gross misdemeanor that may result in harsher penalties than a test failure. The state now appeals.

## ISSUE

Were respondent's due-process rights violated when the implied-consent advisory did not inform respondent that a test refusal is a gross misdemeanor that may result in harsher penalties than a test failure?

## ANALYSIS

■ The prosecuting attorney may appeal to this court from a pretrial order granting a defendant's motion to dismiss a criminal charge if the order is not based solely on a factual determination that there is a lack of probable cause to believe that the defendant has committed an offense. Minn. R.Crim. P. 28.04, subd. 1(1). "[I]n reviewing pretrial prosecution appeals, this court 'will only reverse the determination of the trial court if the state demonstrates clearly and unequivocally that the trial court has erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial.'" *State v. Poupard,* 471 N.W.2d 686, 689 (Minn.App.1991) (quoting *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977)).

■ Dismissal of a charge has a critical impact on the outcome of the trial. *Id.* There is no dispute that the critical-impact requirement has been satisfied. Therefore, our analysis will only address whether the district court erred in its judgment that the implied-consent advisory violated respondent's due-process rights. "This court reviews de novo the procedural due process afforded a party." *Zellman ex rel. M.Z. v. Indep. Sch. Dist. No. 2758,* 594 N.W.2d 216, 220 (Minn.App.1999), *review denied* (Minn. July 28, 1999).

Any person who drives, operates, or is in physical control of a motor vehicle within this state or on any boundary water of this state consents, subject to the provisions of sections 169A.50 to 169A.53 (implied consent law), and section 169A.20 (driving while impaired), to a chemical test of that person's blood, breath, or urine for the purpose of determining the presence of alcohol, controlled substances, or hazardous substances. The test must be administered at the direction of a peace officer.

Minn.Stat. § 169A.51, subd. 1(a) (2004).

At the time a test is requested, the person must be informed:

(1) that Minnesota law requires the person to take a test:

(i) to determine if the person is under the influence of alcohol, controlled substances, or hazardous substances;

(ii) to determine the presence of a controlled substance listed in schedule I or II, other than marijuana or tetrahydrocannabinols; and

(iii) if the motor vehicle was a commercial motor vehicle, to determine the presence of alcohol;

(2) that refusal to take a test is a crime;

(3) if the peace officer has probable cause to believe the person has violated the criminal vehicular homicide and injury laws, that a test will be taken with or without the person's consent; and

(4) that the person has the right to consult with an attorney, but that this right is limited to the extent that it cannot unreasonably delay administration of the test.

Minn.Stat. § 169A.51, subd. 2 (2004). The process of providing a person with the information required under this subdivision is known as an implied-consent advisory.

The state contends that the district court erred in concluding that the implied-consent advisory administered to respondent violated respondent's due-process rights because it did not inform respondent that a test refusal is a gross misdemeanor that may result in harsher penalties than a test failure. We agree that the district court erred.

The Minnesota Supreme Court has held that a portion of the implied-consent advisory violated the constitutional guarantee of due process because it threatened criminal charges that the state was not authorized to impose. *McDonnell v. Comm'r of Pub. Safety*, 473 N.W.2d 848, 855 (Minn. 1991). In reaching this conclusion, the supreme court explained:

The United States Supreme Court has ... recognized that due process does not permit those who are perceived to speak for the state to mislead individuals as to either their legal obligations or the penalties they might face should they fail to satisfy those obligations. In *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), the Court held that due process did not permit the prosecution of individuals who refused to testify before a legislative commission after being incorrectly led to believe by commission members that they could do so under the protection of privilege against compelled self-incrimination. *See id.* at 437, 79 S.Ct. at 1265. The Court noted that *Raley* presented circumstances beyond those prohibited by the void-for-vagueness doctrine: "there were more than commands simply vague or even contradictory. There was active misleading." *Id.* at 438, 79 S.Ct. at 1266.

*Id.* at 854.

■■■ Under *McDonnell*, when Willert administered the implied-consent advisory to respondent, due process did not permit Willert to mislead respondent as to his legal obligations or the penalties he might face if he failed to meet those obligations. But, the implied-consent advisory that Willert administered correctly informed respondent that refusal to take a test is a crime, as required under Minn.Stat. § 169A.51, subd. 2(2), and said nothing about either the penalty for refusing to take a test or the penalty for failing a test. Because the information in the implied-consent advisory was correct and the advisory said nothing about the penalties that respondent might receive, there was no due-process violation for actively misleading respondent.

This does not end our analysis, however, because the district court's conclusion that

the implied-consent advisory violated respondent's due-process rights was based on what the advisory failed to say, rather than on what the advisory explicitly stated. The issue that remains is whether a due-process violation occurred even though the advisory said nothing that actively misled respondent. In *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the United States Supreme Court considered whether failing to fully warn a driver about the consequences of refusing to submit to a blood-alcohol test violated due process.

In *Neville*, a driver who was asked to submit to a blood-alcohol test was warned that he could lose his driver's license if he refused. *Id.* at 555, 103 S.Ct. at 918. The driver refused to take the test, and although South Dakota law specifically permitted the refusal to be admitted into evidence at trial, the driver sought to suppress all evidence of his refusal to take the blood-alcohol test. *Id.* at 556, 103 S.Ct. at 918. The suppression motion was granted, and one of the reasons for granting the motion was that the officers who asked the driver to submit to a blood-alcohol test failed to advise the driver that the refusal could be used against him at trial. *Id.* When the state appealed the suppression order, the driver relied on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), to argue that admitting his refusal at trial violated due process because he had not been fully warned about the consequences of refusal. *Neville*, 459 U.S. at 564, 103 S.Ct. at 923.

In *Doyle*, two men were given *Miranda* warnings after being arrested in connection with a marijuana sale. 426 U.S. at 612, 96 S.Ct. at 2242. Each man took the stand at his trial and told an exculpatory story that he had not told police when he was arrested. *Id.* at 612–13, 96 S.Ct. at 2242. In an effort to impeach the men and

undercut their explanation of events, the prosecutor asked each man during cross-examination why he had not told the exculpatory story to police when he was arrested. *Id.* at 613, 96 S.Ct. at 2242. Defense counsel in each trial objected to the prosecutor's questions, and the objections were overruled. *Id.* at 614, 96 S.Ct. at 2243. The men appealed their convictions alleging, *inter alia*, that the trial courts erred in allowing the prosecutor to cross-examine the men about their post-arrest silence. *Id.* at 614, 96 S.Ct. at 2243.

The Supreme Court agreed and held that even though the *Miranda* warnings the men received did not explicitly tell them that there was no penalty for remaining silent, using the men's silence at the time of arrest for impeachment purposes at trial violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 619, 96 S.Ct. at 2245. The Supreme Court explained that

> while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 618, 96 S.Ct. at 2245.

When the driver in *Neville* relied on *Doyle* in arguing that his due-process rights were violated, the Supreme Court explained that in reaching its holding in *Doyle*, "the Court relied on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Neville*, 459 U.S. at 565, 103 S.Ct. at 923. The *Neville* court then explained why the fundamental unfairness

that existed in *Doyle* was not present in *Neville* when the driver's refusal to take a blood-alcohol test was used as evidence of guilt even though the driver was not specifically warned that his refusal could be used against him at trial. *Id.* First, the right to silence explained in the *Miranda* warnings is a right of constitutional dimension that cannot be unduly burdened, while the right to refuse to take a blood-alcohol test is a matter of grace bestowed by the state legislature. *Id.* Also, the Supreme Court explained,

the *Miranda* warnings emphasize the dangers of choosing to speak ("whatever you say can and will be used as evidence against you in court"), but give no warning of adverse consequences from choosing to remain silent. This imbalance in the delivery of *Miranda* warnings, we recognized in *Doyle,* implicitly assures the suspect that his silence will not be used against him. The warnings challenged here, by contrast, contained no such misleading implicit assurances as to the relative consequences of [the driver's] choice. The officers explained that, if [the driver] chose to submit to the test, he had the right to know the results and could choose to take an additional test by a person chosen by him. The officers did not specifically warn [the driver] that the test results could be used against him at trial. Explaining the consequences of the other option, the officers specifically warned [the driver] that failure to take the test could lead to loss of driving privileges for one year. It is true the officers did not inform [the driver] of the further consequence that evidence of refusal could be used against him in court, but we think it unrealistic to say that the warnings given here implicitly assure a suspect that no consequences other than those mentioned will occur. Importantly, the warning that he could lose his driver's license made it clear that refusing the test was not a "safe harbor," free of adverse consequences.

While the State did not actually warn [the driver] that the test results could be used against him, we hold that such a failure to warn was not the sort of implicit promise to forgo use of evidence that would unfairly "trick" [the driver] if the evidence were later offered against him at trial. We therefore conclude that the use of evidence of refusal after these warnings comported with the fundamental fairness required by due process.

*Id.* at 565–66, 103 S.Ct. at 923–24 (footnotes omitted).

■ Applying the Supreme Court's reasoning in *Neville* to the implied-consent advisory that Willert administered to respondent, we conclude that failing to inform respondent that a test refusal is a gross misdemeanor that may result in harsher penalties than a test failure comported with the fundamental fairness required by due process. Unlike a *Miranda* warning, which affirmatively states that the recipient has the right to remain silent, the implied-consent advisory administered to respondent did not tell respondent that he had a right to refuse to take a chemical test or implicitly assure him that the penalties for a test refusal would not be more severe than the penalties for a test failure. To the contrary, the implied-consent advisory informed respondent that Minnesota law requires him to take a test and that refusal to take a test is a crime. This information made it clear that refusing testing was not an option that would be free of a penalty.

Furthermore, with respect to procedural due process, the Minnesota Supreme Court held in *Friedman v. Comm'r of Pub. Safety,* 473 N.W.2d 828, 835 (Minn.1991), that "under the right-to-counsel clause in

article I, section 6 of the Minnesota Constitution, an individual has the right, upon request, to a reasonable opportunity to obtain legal advice before deciding whether to submit to chemical testing." Under Minn.Stat. § 169A.51, subd. 2(4), an implied-consent advisory must inform a person who is asked to submit to a chemical test that the person has the right to consult with an attorney, and respondent does not contend that his right to counsel was not vindicated. Thus, the procedure accorded respondent when he was deciding whether to refuse testing included an opportunity to obtain legal advice, which, presumably, would include advice about the penalties applicable to his alternative courses of action.

Under these circumstances, failing to inform respondent that test refusal is a gross misdemeanor that may result in harsher penalties than a test failure did not actively mislead respondent as to his legal obligations or implicitly assure respondent that the penalties for test refusal are less serious than the penalties for test failure such that respondent would be unfairly tricked if he later learns that his penalty for test refusal is more severe than the penalty he would have received if he had submitted to a chemical test and failed it.

## DECISION

Because the implied-consent advisory administered to respondent did not actively mislead respondent as to his legal obligations or implicitly assure respondent that the penalties for test refusal are less serious than the penalties for test failure, the district court erred in its judgment that the advisory violated respondent's due-process rights.

**Reversed and remanded.**

RANDALL, Judge (concurring specially).

*Accuse, step forward and confess—or you will stand back convicted.*

I concur in the result, but I am troubled by Minnesota's test-refusal statute. Although not raised here, the statute making test refusal a stand-alone crime appears to impermissibly shift the burden of proof to the defendant. *See Patterson v. New York,* 432 U.S. 197, 206, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977) (due process does not permit the state to place on a defendant the burden of disproving an element of the crime with which she is charged); *see also State v. Auchampach,* 540 N.W.2d 808, 816 (Minn.1995) (stating that due process requires the state prove beyond a reasonable doubt the existence of every element of the crime charged).

On the civil side, the law requiring you to give a test or face possible sanctions has been upheld several times as a legitimate use of police power, with the trade-off being the right to drive on Minnesota highways. *See, e.g., Butler v. Commissioner of Pub. Safety,* 348 N.W.2d 827, 828 (Minn. App.1984) (holding that the Fifth Amendment does not attach to implied-consent proceeding because it is civil in nature and not criminal). But today, a test refusal, whether you have ever had a drop of alcohol or not in your life, is a stand-alone crime, a gross misdemeanor. *See* Minn. Stat. § 169A.26 (2004) (stating that a person's refusal to submit to chemical testing is a third-degree DWI offense, punishable as a gross misdemeanor).

When the state has probable cause to suspect you of DWI, and the officer asks you to take a test to determine intoxication, the burden shifts to you to prove by taking the test that you were not intoxicated. The penalty for not taking up this burden used to be serious, but still civil, so it passed constitutional muster. Now the

penalty for simply standing mute is a crime in and of itself.

There is no parallel that I can find anywhere in American jurisprudence—where a citizen, standing mute before an accusation and not doing anything affirmative to evade arrest or obstruct an officer in the enforcement of the law, is guilty of the crime "standing mute." The closest we come is Minn. R.Crim. Pro. 9.02, subd. 2. There, upon a proper motion and a proper showing, the state can get an order from the court allowing evidence to be extracted from a defendant. And that order is valid whether the defendant cooperates or has to be restrained while the sample is taken. *But under no circumstances is refusal to cooperate a separate crime.* I suspect it could not pass constitutional muster if that were the case. I can hardly believe the state has not thought of asking for criminal sanctions for a defendant's violation of Rule 9—if they thought they could get away with it.

With a return to the former law where test refusal was a civil matter, the state still has the carrot of serious civil sanctions. Returning test refusal to the civil side would still allow the state to enforce penalties and deny/limit driving privileges to the motorist, but it would no longer have a Fifth Amendment Bill of Rights odious stink about it.

The usual justification for "implied consent" laws is that all motorists using Minnesota highways "impliedly consent" to submit to tests for intoxication while driving, upon a proper request (the "proper" is later ironed out in court if the motorist requests). However, no state law can trump a citizen's right to the protections of the United States Constitution. It is boilerplate law that a state constitution can give more rights to its own residents than the United States Constitution, states simply cannot give less. *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980). For instance, no state law can trump a citizens Sixth Amendment right to their trial by jury with the aid of competent counsel, either hired or appointed. No state law can trump the Fourth Amendment's protection against "unreasonable searches and seizure." So how do we justify "test refusal as a crime" apart from the underlying merits of the case. It is not that the state cannot, upon a proper showing, forcibly extract evidentiary specimens from a defendant. *see Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966). But under no scenario, is the motorist's refusal to cooperate a separate crime! The citizen always has the right to say in that situation "Officer, do whatever you are going to do and you have to justify it later and the burden of proof for the justification is on you. I am not going to volunteer anything because if I do I might waive any constitutional objection that I have." In that scenario, the state proceeds at their peril and has the burden of proof to show in a court of law that the involuntary extraction was reasonable and constitutional. That scenario leaves the burden of proof where it always belongs, on the state. That is a far cry from "test refusal" where the state claims the right to say "We do not have to do anything, you have to volunteer a test, or we will charge you with a crime of 'not volunteering.'"

No citizen in this country parks their constitutional rights, when they take their car out of park.